## GOODYEAR *v.* DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—BOARDING CAR—NEGLIGENCE.
    Testimony in plaintiff's behalf that the decedent attempted to board defendant's car while it was standing, that, as he put his foot on the steps, the car started with a jerk, throwing him under the wheels and fatally injuring him, although defendant's testimony tended to contradict the claim that the car was standing still, sufficiently presented a question for the jury.

2. SAME—CARRIERS—WEIGHT OF EVIDENCE.
    The testimony of the witnesses, being in dispute, was for the jury to weigh and the court rightly denied a motion for a new trial on the ground that the verdict was contrary to the weight of evidence.

3. SAME—NEW TRIAL—CUMULATIVE EVIDENCE.

Held, also, that the court properly refused a new trial on the ground of newly discovered evidence which appeared to be merely cumulative and was not likely to change the result.

4. SAME.

The discretion of the trial court in denying a new trial for the reason that new evidence has been discovered, will not be disturbed. on appeal, unless a clear abuse thereof appears.

Error to Wayne; Murphy, J. Submitted June 10, 1913. (Docket No. 63.) Decided September 30, 1913.

Case by Arthur A. Goodyear, as administrator of the estate of Albion A. Goodyear, deceased, against the Detroit United Railway for the unlawful killing of decedent. Judgment for plaintiff. Defendant brings error. Affirmed.

*Corliss, Leete & Joslyn (Wm. G. Fitzpatrick, of counsel), for appellant.*

*Choate, Webster, Robertson & Lehmann, for appellee.*

STEERE, C. J. Plaintiff, as administrator, brought this action to recover damages for 'the estate of his father, Albion A. Goodyear, who sustained injuries, from which he subsequently died, while attempting to board one of defendant's cars while transferring at the intersection of Clay and Oakland avenues, in the city of Detroit. Oakland avenue runs north and south and is crossed by Clay avenue running east and west, in said city. Defendant maintains a double-tracked line on Oakland and a single-tracked line on Clay, connected with the two tracks on Oakland by a double switch. Some of the cars going north on Oakland run through to the city limits, while others

turn at Clay and proceed easterly along that avenue, Passengers going south on Oakland and wishing to go east on Clay make connections and transfer at that street intersection.

Deceased was a woodworker by trade, employed by the Wilson Body Works, earning $2.75 per day; he lived on Harmon avenue, north from Clay near Oakland, and traveled the route mentioned in going to and from his place of employment. He was 67 years of age, vigorous, a member of a long-lived family, and in perfect health at that time. On the morning of December 6, 1910, at about 6 o'clock, starting to his work, he took a south-bound Oakland avenue car which made its stop at Clay about opposite the north curb of the latter avenue. Deceased, with other passengers, left it by the rear door, crossing the tracks and switches on Oakland, to board the east-bound Clay car which stood waiting to the south of the switch on Oakland at the regular stopping place for transfer. At this time of the day workmen were going to their places of employment and the Clay car was crowded; it being somewhat difficult to get even standing room. A number of passengers got upon the car both at the front and rear platforms. The operators of this car were both extra men, not on regular runs. After stopping at the place of transfer the motorman set the switch for Clay avenue and resumed his position at the front, and the conductor stood on the rear platform to attend the trolley as the car swung around the curve onto Clay avenue. At the time of the transfer passengers crowded the platforms around both men. About the time the motorman, on signal from the conductor, started the car, deceased was attempting to get upon the front platform.

It is the claim of plaintiff that the car was standing when deceased attempted to get on board of it, but that it was suddenly started just as he was in

the act and before he had opportunity and reasonable time in which to complete such act, throwing him down so that he fell partially under the car; his right foot was crushed and he received fatal injuries. Immediately after the accident he was taken to a hospital where his injuries were attended to and his mangled foot was amputated; but he died that afternoon.

On behalf of defendant it is contended that deceased made the attempt to catch the car after it had started, meeting it when it swung around the curve onto Clay from its stopping place on Oakland, as he came southeast from the rear of the Oakland car he had just left, and was therefore guilty of such negligence on his own part as precluded recovery.

Plaintiff recovered a verdict and judgment for $2,500. Defendant thereafter moved for a new trial, on the ground of newly discovered evidence, because the verdict was against the weight of evidence and because the court had erroneously denied defendant's previous motions, made during the progress of the trial, both at the conclusion of plaintiff's testimony and of all the evidence, for a directed verdict in its favor. This motion was also denied.

The errors argued in defendant's brief and relied upon are:

"(A) Overruling its motion for a directed verdict made at the close of plaintiff's evidence.

"(B) Overruling its motion for a directed verdict made at the close of all the evidence.

"(C) Overruling its motion for a new trial on all the grounds, but particularly on the ground of newly discovered evidence."

While negligence is said to be a mixed question of law and fact, the mixture is less confusing and the lines more distinctly drawn in cases of this nature, where the standard of duty and responsibility is not variable and shifting according to the circumstances

of each particular case; here it is fixed and well defined.

When street railway companies are furnishing transportation along their lines to the public for hire, starting and stopping at frequent intervals to receive and discharge passengers, the respective rights and duties of each at such times are definite. The law is well settled and its application positive when the facts are once ascertained. The trial court distinctly and correctly stated it to the jury in plain language, which could not be misunderstood. The jury was told that:

"Where a car operated by a company is standing still, and a passenger, or a prospective passenger, seeks to board that car, it is the duty of the company, through its employees in charge of the car, to keep the car standing still until a reasonable opportunity is afforded the person seeking to board it to get on and come to a position of safety upon the car; and if, while a car is standing still, one of those seeking to board the car is prevented from completing the act of getting on it, by reason of the car being moved forward, and the person thus prevented be thrown to the pavement and injured, for any such injuries received in such manner as that the defendant company would be liable.  *  *  *

"The defendant claims, as I stated, that Mr. Goodyear attempted to board the car while it was in motion. If this is shown to your satisfaction, then the defendant would be entitled to a verdict. One who attempts to board a moving car under the conditions shown in this case, if he be injured, cannot hold the company responsible for any injury.  *  *  *

"The sole ground upon which the plaintiff may recover under the declaration filed, and under the testimony given before you, is that Mr. Goodyear began the act of boarding the car when the car was stationary, standing still, and that when he was in the process of getting on the car, and before he had reasonable opportunity to complete the act, it was started forward, precipitating him to the pavement. That

is the sole question presented under the plaintiff's case for your decision."

No complaint is made of the charge of the court provided the case should have been submitted to a jury. Refusal to direct a verdict is the error assigned and argued.

Of the eight witnesses who gave testimony relating to the accident, including the conductor and motorman, but one, Duford by name, was an eyewitness to deceased's attempt to board the car. He was on the ground and gave the alarm. The others were on the car and first learned of the trouble when the alarm was given. Another witness, named Errick, who was on the rear platform and looked around, saw deceased in the act of falling but says he did not know whether he was getting on or off.

Duford worked for the American Blower Company and had come south from his home on the same car with deceased, whom he only knew by sight, having seen him from time to time as they rode on the same cars to and from their work. Duford also desired to take the Clay avenue car east to his place of employment and left the Oakland avenue car, by the rear door, behind deceased. He was a cripple and, not being able to move as rapidly as the others, fell behind. He testified, that he was within about 25 feet of the Clay avenue car when it started and had a clear view of what transpired; that the car which was going out Clay avenue had stopped that morning, at the usual place of stopping, on the south side of Clay and south of the switch. He described the accident as follows:

"When we got to the corner of Clay we got off the car, Mr. Goodyear ahead of me, and I was on the back of the car and was following him, to take the car going out Clay. There was a car standing on Clay avenue, waiting to follow the one going down town that we had gotten off of. Another car coming from

town that both Mr. Goodyear and I wanted to take to go out to work. This car I didn't feel as though I could make it. I kind of held back, not knowing whether the car to go down town would start out while we were in the middle of the track or not. Anyway, we got over to the car that was going up Clay. * * * Mr. Goodyear placing his left hand —no, his right hand—on the handle of the front vestibule of this car going out Clay, and his left foot on the icy step. The car gave a jerk, throwing Mr. Goodyear to the pavement, his right foot under the front wheel. When I saw him fall I hollered or rather hollered and then I hollered, and the car at the time was in motion, and I think, if the car had stopped when both Mr. Goodyear and I—" etc.

A witness named McCall testified:

"I was standing up about the center of the car. * * * The car started up and I felt a jar. * * * I heard some one say some one was run over. I got out of the car at the back door and Mr. Goodyear was lying on the pavement. * * * From the time the car started until it stopped it did not go over 6 or 7 feet."

We think it clearly manifest that plaintiff's testimony had sufficient probative force to establish his claim *prima facie*, and there was a conflict as to whether or not his case was made out entitling him to go to the jury.

It is urged that the verdict should be set aside because it is against the weight of evidence. But one of defendant's witnesses, Errick, saw any part of this accident. He testified to seeing deceased falling, and that the car ran 16 to 20 feet. This is in conflict with the testimony of Duford, who says deceased fell when the car made its initial start, and of McCall, who gives the whole distance the car ran as 6 to 7 feet. The four other witnesses of defendant testified as to the distance the car ran before it was stopped and where deceased lay after the accident, giving evi-

dence from which the inference would arise that he attempted to board the car while it was in motion.

The conductor and motorman, whose duty it was to watch and take precautions to guard the safety of persons entering and leaving the car, had no knowledge of the accident until it was over. The conductor, who was in the middle of the rear platform, which was crowded with standing passengers, taking care of the trolley, testified that when he gave the signal to start no one was trying to get on the front platform "as far as I could see," and the car went 25 or 30 feet before he knew anything was wrong. Being asked, "Q. You don't know much about the accident how it happened?" witness replied: "No, sir; I don't."

The motorman testifies:

"These people went in the car, right in the vestibule with me, and some of those people were standing between me and the steps.

"Q. Did you ask those people if it was all right, if there was any person there, to go ahead?

"A. I could see that it was all right.

"Q. You could see over the heads of these people?

"A. Yes, sir.

"Q. And you saw the bottom step.

"A. No; but I could see they were all on.   *   *   * There were men between me and the entrance; they were all holding onto the handles and feet on the steps, and they were doing that when I started the car.

"Q. You don't know whether there was a man then on the step or not?

"A. He was on the step.

"Q. He was on the step when you started?

"A. I don't know whether he was on the step, but some were on the step when I started.

"Q. You don't know whether Mr. Goodyear was there or not?

"A. I don't know."

It is an elementary rule that the credibility of witnesses and the weight to be given their testimony is

for the jury. No attack was made upon the veracity of the various witnesses sworn, nor was any attempt made to impeach them, except as their testimony was in conflict. They were apparently disinterested witnesses, unless it were the conductor and motorman, of whom it could well be urged that their evidence was the least satisfactory and convincing. On this basic issue in this litigation the case turned upon the greater weight given by the jury to the testimony of witnesses on the one side or the other. The jury heard and saw these witnesses. On reading the evidence as a whole, we are not impressed that the same is so convincing and overwhelmingly conclusive in support of the defense as to render it imperative for the court to invade the province and customary prerogatives of the jury to set aside a verdict, rendered upon conflicting evidence, on the ground that it is unjust and palpably against the great weight of the testimony.

One of the reasons urged in support of defendant's motion for a new trial was the newly discovered evidence of a witness named Otto, whose affidavit was presented in support of said motion. When the motion came on to be heard, said witness was produced in open court for examination, on order of the trial judge. He testified to getting upon the Clay avenue car while it was standing and seeing a gray-haired man pass in front of the car after it had started and was moving slowly around the curve, following which the car stopped with a bump after it "had gone 5 or 6 feet or possibly more," and some one said it had run over a man. His testimony is in conflict with that of other of defendant's witnesses as to the distance the car ran before it was stopped and as to its being stationary when the Oakland car arrived. He testified:

"The car was slowly making the turn there, and

the south-bound car coming down, and people got off, running around the front end of our car and a few got on, I imagine. Amongst those running around in front of the car I noticed an old gray-haired man. * * * I didn't inquire about what was the matter until I got to the shop, and some other fellows came in and they said it cut his leg off. * * * I could not see the bottom step from where I stood. I didn't see Mr. Goodyear when he started to go on the car. * * *

"Q. You don't know what the car was doing when he started to get on?

"A. No, sir."

The material portion of his testimony strongly urged is that deceased tried to board the car after it started and was going around the curve.

In denying the motion for a new trial, the court said relative to the claim of newly discovered evidence:

"The affiant, Henry H. Otto, was produced in court pursuant to the court's request, and his statement given. The most that can be said in its favor, I think, is that it is merely cumulative. It is not as strongly corroborative of defendant's theory as was the testimony given by the defendant's witnesses, who swore, at least inferentially, that the car in question was in motion when the deceased sought to board it. Had Mr. Otto been sworn upon the trial I do not see that the result would have been in any way affected; nor is it at all probable, in my view, that upon a new trial his testimony would change the outcome. Upon the authority of *Branch* v. *Klatt* I think the motion made in this respect should be denied."

We think the trial court correct in the conclusion that the newly discovered evidence was at best cumulative and not so strong and convincing as to render a different result probable upon a retrial of the case. Those are, however, primarily questions for the trial court, who heard and saw not only the witnesses at the trial but the newly discovered witness. The appellate court will not disturb the discretion of the

trial court in such cases unless it is clear that the same has been abused. *Jones & Co.* v. *Tucker*, 132 Ala. 305 (31 South. 21) ; *Branch* v. *Klatt*, 173 Mich. 31 (138 N. W. 263). *Vide,* also, 29 Cyc. pp. 1008-1010, where a large number of cases are cited on the subject of newly discovered evidence. We do not find from this record an abuse of discretion which demands interference by this court.

The judgment is affirmed.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.